**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| JENNIFER M. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:23-cv-0886-JHE |
| | ) | |
| SALEM CARRIERS, INCORPORATED, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER[1]**

On July 7, 2023, Plaintiff Jennifer M. Taylor ("Taylor") initiated this action against Defendants Jeffery A. White ("White") and Salem Carriers, Incorporated[2] ("Salem Carriers") alleging state law claims of negligence and wantonness against both defendants. (Doc. 1). This matter arises from a motor vehicle accident which Taylor alleges was caused by Mr. White's negligent and wanton operation of the vehicle he was driving. (*See* Doc. 1 ¶¶ 4, 10, 14). Taylor alleges that White was acting in the line and scope of his employment with Salem Carriers when the accident occurred. (*Id*. at ¶¶ 11, 14). Taylor alleged that Salem Carriers negligently and wantonly operated a commercial carrier with inadequate safety management controls; negligently and wantonly entrusted the vehicle to White; negligently and wantonly hired, trained, supervised,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 18.)

[2] Salem Carriers was initially misidentified as Salem Leasing Corporation. (Doc. 1). The misnomer was later corrected. (*See* Docs. 47, 48).

and monitored White and negligently and wantonly continued White's employment. (Doc. 1 at 5, 7-9). Taylor further alleged that Salem Carriers negligently and wantonly failed to maintain and inspect the truck. (*Id*. at 6-9). Taylor claims that the negligent and wanton behavior of both defendants proximately caused the injuries and damages she sustained in the accident. (*Id*. at 6, 9).

Pending before the undersigned are the following motions for partial summary judgment: (1) Salem Carriers' motion for partial summary judgment as to Taylor's claims of negligent entrustment and negligent hiring, training, supervision, and retention (Doc. 66); (2) Taylor's motion for partial summary judgment as to her claim of wantonness against White and her claim that White was acting within the line and scope of his employment with Salem Carriers at the time of the accident (Doc. 63); and (3) White's motion for partial summary judgment as to Taylor's wantonness claims against him and any claim she may have for punitive damages (Doc. 74). For the reasons discussed below, Salem Carriers' motion is due to be GRANTED, Taylor's motion is due to be GRANTED IN PART and DENIED IN PART, and White's motion is due to be DENIED.

## I. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving

party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). When, as here, the parties have filed cross-motions for partial summary judgment, the Court evaluates each motion separately, viewing the evidence in the light most favorable to the nonmovant as to each motion. See *Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

This matter arises from a motor vehicle accident that occurred on November 3, 2022, at 12:35 p.m. (Doc. 67 at 1; Doc. 49 ¶ 5). Taylor and White were driving at or near the intersection of US-280 and CR-41 in Shelby County, Alabama. (*Id.*). White was employed by Salem Carriers,

and was driving a tractor trailer that was leased by Salem Carriers. (Doc. 49 ¶¶ 5-8; Doc. 67 at 1). White was traveling west on Highway 280, while Ms. Taylor was driving her vehicle South on CR-41. (Doc. 67 at 2). White ran the red light at the intersection and struck another vehicle. (Doc. 68-1 at 68:7-12). That vehicle then struck Taylor's. (Doc. 67 at 2; Doc. 68-3 at 42:2-22).

White applied for a job with Salem Carriers in April 2022. (Doc. 64 ¶ 1; Doc. 64-1 ¶ 17). He reported in his application that he had worked as a driver for five different companies since 2019. (Doc. 64-3 at 2-5). As part of the hiring process, Salem Carriers did a background check of his employment history. (Doc. 64-4 at 45:14-46:8). The employment check showed that he had an unsatisfactory safety record with TransAm Trucking. (Doc. 64-4 at 46:14-17; Doc. 69-1 at 11). While at TransAm, there was a report on White that indicated he was operating a commercial vehicle while using additional equipment accessories that decreased the safety of operating the truck. (Doc. 64-4 at 3:19; Doc. 64-5 at 2).

White testified that, while at TransAm, he was in Oklahoma and began listening to comedy videos on YouTube during his mandatory 30-minute work break. (Doc. 64-2 at 40:6-44:18). When he began driving again, White put the tablet on his dashboard and continued listening to the videos. (*Id.*). He was stopped by law enforcement to check his logs, and received a violation for listening to the tablet, but he was not cited. (*Id.*). White reported that he had not received any traffic violations in the prior five years, had no criminal record, and had been involved in one traffic accident for which no evidence was presented that White was at fault. (Doc. 64-3 at 10). White had to complete a pre-employment drug and alcohol screening, which was negative for both. (Doc. 64-1 ¶ 19; Doc. 64-2 at 48:9-20). After the drug and alcohol screening, he attended a Zoom conference during which he was informed that he had been hired by Salem Carriers. (Doc. 64-2

at 48:20-49:11). White testified that, after he was hired, he traveled to Texas and was shown the order of operations for Salem.  (*Id*. at 50:11-22).  He then went on a ride-along from Texas to Florida with a Salem Carriers employee named Jose.  (*Id*. at 51:1-11).

When asked about whether drivers are authorized to use a tablet while driving, Jerry Waddell, Salem Carriers' vice president of safety noted "[a]s long as it's not a handheld device, he's welcomed [sic] to listen to music, play the radio, whatever."  (Doc. 64-4 at 9:1-10:17, 56:5-10).  Regarding the training that drivers undergo, Waddell testified that the orientation process is a four to six hour presentation that reviews Salem Carriers' policies and company manual and can be done via Zoom.[3]  (*Id*. at 34:11-35:17).  Waddell further noted that new hires are not given road tests unless they will be driving equipment that is different than what they had been operating previously but that, if the equipment is comparable, the previously issued road-tests will be accepted.  (*Id*. at 34:18-35:6).  Waddell testified that Salem Carriers has safety meetings twice a year, with monthly online training for drivers and safety bulletins released throughout the month.  (Doc. 68-2 at 12:1-21).

A day prior to the accident at issue, White left Florida with his truck to pick up a load in Sylacauga, Alabama.  (Doc. 64-2 at 54:6-20).  As he was getting into Pensacola, Florida, White heard a noise he thought may have been a tire popping.  (Doc. 64-2 at 56:11-14).  White pulled off and stopped at an exit but did not see any problems with his tires.  (*Id*. at 56:19-23).  He then doubled-back to a Love's truck stop where he checked all his tires and airbags and listened for

---

[3] White testified that, upon being hired, he did not have any formal training from Salem Carriers other than the ride-along.  (Doc. 64-2 at 50:2-16).

leaks, but he did not find any problems. (*Id.* at 57:3-8). He then continued with his route. (*Id.* at 57:8-9). White was driving just past Montgomery, Alabama, when he applied the brakes at a yellow light. (*Id.* at 57:11-15). He indicated that by the time he was able to stop he was "almost in the middle of the intersection." (*Id.* at 57:14-16). According to White, he thought his trouble braking was due to his light weight and speed of travel, so he continued on. (*Id.* at 57:15-22). He testified that at the end of the day he did not hear any air leaks and did not hear anything the next morning during his pre-trip check. (*Id.* at 58:3-9). White spent the night in Sylacauga the night prior to the accident.[4] (*Id.* at 54:15-23).

White testified that, because his training led him to believe nothing was wrong with his truck, he did not notify Salem Carriers of any issues. (Doc. 64-2 at 58:8-61:4). On the morning of the accident, White left Sylacauga and headed toward Birmingham on Highway 280. (*Id.* at 61:17-62:1). He had been on the road for less than 15 minutes prior to the accident and testified that the road had thus far been relatively flat, with no downhill sections. (*Id.* at 62:6-18). White also noted that any traffic lights he had encountered prior to the accident were green, and he had not noticed anything wrong with his truck. (*Id.* at 62:21-63:3). As he approached the intersection where the accident occurred, a yellow light began flashing that indicated a stop light ahead was about to turn red. (Doc. 64-2 at 64:6-16). White indicated that he applied his brakes in anticipation of the red light, but his brakes did not work. (*Id.* at 64:13-16). According to White, he ran the red

---

[4] White later testified that after he slept he was making his way to Sylacauga. (Doc. 64-2 at 57:11-13). Though there is some confusion regarding where White spent the night before the accident, it is not an issue that has been argued as pertinent to the claims of negligence and/or wantonness against him.

light because his brakes did not work, causing the accident at issue. (*Id*. at 68:7-11). White testified that, as he realized he was going to run the red light and go through the intersection, he had his Jake-brakes on full, was using his breaks as much as possible, and was leaning on his horn. (*Id.* at 76:8-15).

Taylor testified that she did not hear Jake-brakes, White's horn, or any tire sounds as White came through the intersection. (Doc. 64-9 at 39:3-40:6). She did testify, however, that she used her horn to try and warn Hunsacker, the driver of the other vehicle, that White was approaching. (*Id.* at 39:10-40:1). Taylor saw White's truck hit Hunsacker's car on the front left side, near the driver's side door. (*Id*. at 41:2-17). Hunsacker's car then spun and hit Taylor's car. (*Id.* at 41:20-42:21). The impact spun Taylor's car around and sent it into the guardrail. (*Id*. at 43:7-21). Taylor was initially rendered unconscious by the impact, and woke up to her telephone auto-dialing 911 to report the crash. (*Id*. at 46:7-21). Taylor was transported by ambulance to Grandview Hospital. (*Id*. at 57:3-58:11).

### III. Analysis

Only some of the claims in the complaint are currently at issue in the cross-motions for partial summary judgment. Taylor asserted in her complaint the following negligence claims: (1) negligent operation of a commercial motor vehicle against White and (2) negligent inspection and maintenance, negligent entrustment, and negligent hiring, training, supervision and retention against Salem Carriers. (Doc. 1 at ¶¶ 10, 12). She also asserted the following wantonness claims: (1) wanton operation of a commercial motor vehicle against White and (2) wanton inspection and maintenance, wanton entrustment, and wanton hiring, training, supervision and retention against Salem Carriers. (Doc. 1 at ¶¶ 14, 16). However, Taylor later conceded all wantonness claims

against Salem Carriers, and her negligent inspection and maintenance claim against Salem Carriers, agreeing that summary judgment in favor of Salem Carriers is appropriate. (Doc. 80 at 7). As such, all claims originally brought against White remain, while the claims remaining against Salem Carriers are solely for negligent entrustment and negligent hiring, training, supervision and retention. (*Id.*)

The cross-motions for partial summary judgment address the wantonness claims against White and the remaining negligence claims against Salem Carriers. (Docs. 63, 66, 74). In her motion for partial summary judgment, Taylor requests summary judgment on the following: (1) White was an employee of Salem Carriers and was acting within the line and scope of his employment at the time of the collision and (2) White wantonly operated the tractor-trailer, causing the collision. (Doc. 63 at 1). Though Salem Carriers does not specifically concede Taylor's first point, it states in its brief in support of its motion for partial summary judgment that, on the date of the accident "White was employed by Salem and was driving a tractor trailer leased by Salem travelling West on Highway 280." (Doc. 67 at 1). As there appears to be no factual dispute regarding White's employment (*see* doc. 80-4 at 80:5-11), Taylor's motion for summary judgment is due to be **GRANTED** as to the fact that, at the time of the accident, White was an employee of Salem Carriers and acting within the line and scope of his employment.

In its motion, Salem Carriers moves for summary judgment as to Taylor's claims of negligent entrustment and negligent hiring, training, supervision and retention.[5] (Docs. 66, 67).

---

[5] Salem Carriers moved for summary judgment as to Taylor's claims of wantonness and negligent inspection and maintenance as well. (Doc. 66 ¶ 9). However, Taylor has conceded those

Finally, White has moved for partial summary judgment as to the wantonness claims against him and as to Taylor's potential claim for punitive damages.  (Docs. 74, 75).

### A. Negligent Entrustment, Hiring, Training, and Supervision

#### 1.  Negligent Entrustment Claim

Salem Carriers asserts that it is entitled to summary judgment as to Taylor's claims of negligent entrustment, hiring, training, and supervision.  To establish a negligent entrustment claim under Alabama law, Taylor must show: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages.  *Askew v. R&L Transfer, Inc.*, 676 F. Supp. 2d 1298, 1303 (M.D. Ala. 2009) (citing *Prior v. Brown & Root USA, Inc.*, 674 So. 2d 45, 51 (Ala. 1995)).  "[T]he incompetence of a driver is measured by the driver's demonstrated ability (or inability) to properly drive a vehicle."  *Id.* (citing *Halford v. Alamo Rent-A-Car, LLC*, 921 So. 2d 409, 413-14 (Ala. 2005)).  Thus, to prove negligent entrustment, Taylor must show that Salem Carriers either knew or should have known that White was incompetent to drive.  *Bruck v. Jim Walter Corp.*, 470 So. 2d 1141, 1144 (Ala. 1985).

Taylor argues that there remains a question of fact as to whether White was incompetent to drive the vehicle.  In support of her assertion, Taylor cites White's employment as a driver for TransAm.  She cites two incidents, specifically.  First, Taylor cites the violation White received for having something playing on his iPad while driving for TransAm.  (Doc. 80 at 12).  Second,

---

claims and, therefore, Salem Carriers motion for summary judgment is due to be GRANTED as to those claims without further discussion.

Taylor notes that White was involved in an accident while employed with TransAm. (*Id.*). She claims that White's safety record at TransAm was "unsatisfactory," and that he was terminated.

Waddell testified for Salem Carriers regarding White's safety history prior to being hired by Salem Carriers. Waddell noted that Salem Carriers obtained information about White's driving history from HireRight, an employment history record keeping company. (Doc. 80-4 at 45:19-46:4). Waddell noted that the HireRight report showed that White was employed by TransAm from April 2019 through September of 2019. (*Id*. at 46:9-13). Waddell also agreed that the HireRight report said White's safety record was unsatisfactory. (*Id*. at 46:14-17). Waddell testified in his deposition that White's preemployment screening document from the Federal Motor Carrier Safety Administration indicated that White received a non-out-of-service violation for operating the truck "with additional equipment … that decreases the safety of operation." (*Id*. at 46:18-47:19). White testified regarding the accident he was in while driving for TransAm. He said that he "was in Ohio with TransAm Trucking . . . and one night a guy hit my truck." (Doc. 80-2 at 27:3-13).

Taking the facts in the light most favorable to the non-moving party, Taylor, these incidents are not sufficient to allow a jury to determine that White was incompetent under Alabama law. Another judge of this court addressed the issue of whether a driver was incompetent under Alabama law in *Wallace v. Ebaugh*, No. 2:20-CV-02062-KOB, 2022 WL 17672619 (N.D. Ala. 2022). The driver in *Wallace* had a driving history that included four speeding tickets over the six year period preceding the accident at issue as well as a Federal Motor Carrier Safety Administration for failure to obey a traffic control device. 2022 WL 17672619, *4. In evaluating the driver's competence, Judge Bowdre stated:

10

In *Thompson v. Havard*, 235 So. 2d 853, 857 (Ala. 1970), the court found a jury issue regarding competence where a driver had 11 moving violations over a period of about three years.  Conversely, the court in *Thompson* quoted with approval a Texas case stating that "proof of only one previous traffic violation is grossly inadequate to establish incompetency or recklessness, and proof of two moving violations or accidents within a two year period prior to the accident made the basis of the suit, is probably insufficient," 235 So. 2d at 857 (quoting *Broesche v. Bullock*¸427 S.W.2d 89, 93 (Tex. Civ. App. 1968))(internal citations omitted).  The Supreme Court of Alabama likewise affirmed a grant of summary judgment appropriate where the plaintiff's only evidence of a driver's incompetence was two speeding tickets within five years of the accident and a DUI charge within ten years of the accident.  *Prior v. Brown & Root USA, Inc.*, 674 So. 2d 45, 51-52 (Ala. 1995).

District courts in this circuit applying Alabama law have gleaned from past precedents the principle that "several traffic violations do not establish habitual negligence if they occur under 'diverse circumstances.'" *Green v. Markovitch*¸ 385 F. Supp. 3d 1190, 1197 (N.D. Ala. 2019) (citing *Craft*, 107 F. Supp. 3d at 1225).  "Instead, the kind of habitual negligence that amounts to incompetence under Alabama law includes situations where an employee engaged in the same negligent practice numerous times."  *Green*¸ 385 F. Supp. 3d at 1197 (citing *Pritchett v. ICN Med. All., Inc.*, 938 So. 2d 933, 941 (Ala. 2006)).  For example, the plaintiff had presented a genuine issue of material fact regarding competency by presenting evidence that the driver "had two DUI convictions, four accidents in two years preceding [the accident at issue], and admitted 'dependency' on [two medications].  *Hobbs v. U.S. Xpress, Inc.*, No. 18-cv-02129-LSC, 2021 WL 913398, *4 (N.D. Ala. Mar. 10, 2021).

Here, plaintiffs have presented evidence that Mr. Ebaugh was cited for speeding four times in the six years prior to the accident.  The court finds this record closer to those at issue in cases where courts applying Alabama law have found the evidence insufficient to create an issue of fact regarding incompetence than to *Hobbs* or *Thompson*.  Three of Mr. Ebaugh's four speeding convictions date from July 2017 or earlier, leaving only one within the two years prior to the November 2019 accident.  The Supreme Court of Alabama has stated that one violation in two years is "grossly inadequate" to establish incompetence.  *Thompson*¸ 235 So. 2d at 857.  Thus, Mr. Ebaugh's prior speeding tickets are insufficient to demonstrate incompetence here.

*Wallace*, 2022 WL 17672619, *5.  Although *Wallace* is not binding, the undersigned finds that it accurately states Alabama law and that its reasoning is persuasive.

Taylor provides evidence of one accident (with no evidence in the record that White was at fault) and one non-out-of-service violation. These two incidents are not sufficient to establish "the kind of habitual negligence that amounts to incompetence under Alabama law. . ." *Green v. Markovich*, 385 F. Supp. 3d 1190, 1197 (N.D. Ala. 2019) (citing *Pritchett v. ICN Med. All, Inc.*, 938 So. 2d 933, 941 (Ala. 2006). As such, Taylor's claim for negligent entrustment fails, and Salem Carriers' motion for summary judgment is due to be GRANTED as to this claim.

### 2. Negligent Hiring, Training, Retention and Supervision Claim

To support a claim of negligent hiring, supervision, retention and training, Taylor must demonstrate: (1) White committed a tort recognized under Alabama law, *see Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999); (2) White was incompetent to drive his tractor trailer, *see Lane v. Central Bank of Alabama*, 425 So. 2d 1098, 1100 (Ala. 1983); (3) Salem Carriers had actual notice of White's incompetence or would have known had they exercised due diligence, *see Armstrong Bus. Svrs. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001); and (4) Salem Carriers failed to respond to this notice adequately, *see Askew v. R&L Transfer, Inc.*, 676 F. Supp. 2d at 1303-04.

To prove a claim under Alabama law for negligent entrustment, negligent hiring, negligent supervision or negligent retention, Taylor must demonstrate that Salem Carriers knew, or in the exercise of ordinary care should have known, that Mr. White was incompetent. *See Armstrong Business Services ,* 817 So. 2d at 682 (negligent supervision); *Bruck*, 470 So. 2d at 1144 (negligent/wanton entrustment); *Brown*, 277 So. 2d at 895 (negligent retention); *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000) (negligent hiring). Additionally, an act of incompetence does not prove an improper hiring, training or supervision claim. *See Armstrong*

*Business Services*¸ 817 So. 2d at 682.  Specifically, "[i]t is not sufficient merely to allege, or to show, that the employee acted incompetently.  A plaintiff must establish 'by affirmative proof' that the employer actually knew of the incompetence, or that the employer reasonably should have known of it." *Id.* at 683 (citing *Lane*, 425 So. 2d at 1100).

As noted, Taylor has failed to present evidence sufficient to lead a jury to reasonably infer that White was incompetent, much less evidence that Salem Carriers should have known that he was incompetent.  In addition to the driving history that Taylor cited, she also argues that the information cited was revealed in the background check Salem Carriers performed prior to hiring White.  (Doc. 80 at 12).  She also asserts that there is a factual issue regarding whether Salem Carriers' training of new drivers is adequate.  Specifically, Taylor takes issue with the fact that Salem Carriers did not require White to perform a driving test before hiring him.  (*Id.* at 12-13).  The training issues are immaterial, however, because training policies and procedures are one way for a company to work to ensure the competence of its employees, but not the only way, and Taylor does not cite any authority finding that training is dispositive of the issue.  Even if Salem Carriers' training practices were determined to be insufficient, those practices are not evidence that White was not competent or that Salem Carriers should have been aware of any alleged incompetence.  Simply put, the evidence provided by Taylor is not sufficient to allow a jury to reasonably infer that Salem Carriers was negligent or wanton in its hiring, training, retention, or supervision of White.  As such, Salem Carriers' motion for partial summary judgment is due to be GRANTED on this claim.

**B. Wantonness**

Taylor and White have filed cross-motions for partial summary judgment as to Taylor's claim of wantonness against White. (Docs. 63, 74). Taylor argues that there is no genuine dispute of material fact that White recklessly operated his tractor trailer, and the result of that recklessness was the accident at issue. (Doc. 64 at 7). Conversely, White contends that there is no genuine issue of material fact or substantial evidence of wantonness. (Doc. 74 ¶¶ 1-2). White further argues that "there is no clear and convincing evidence of wantonness to support a punitive damage award." (*Id*. ¶ 3).

Under Alabama law, "wantonness" is "[c]onduct which is carried on with a reckless or conscious disregard for the rights or safety of others." ALA. CODE §6-11-20(b)(3). Wantonness is a high *standard* of culpability and "not merely a higher *degree* of culpability than negligence." *Askew v. R&L Transfer, Inc.*, 676 F. Supp. 2d 1298 (M.D. Ala. 2009) (quoting *Tolbert v. Tolbert*, 903 So. 2d 103, 114 (Ala. 2004)) (emphasis added). Wantonness requires the "conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do any act, injury will likely or probably result." *Clark v. Kindley*, 10 So. 3d 1005, 1008 (Ala. Civ. App. 2007) (quoting *Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998)); *see also Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994) (quoting *Stone v. Southland Nat'l Ins. Corp.*¸ 589 So. 2d 1289, 1292 (Ala. 1991)). "Conscious" means perceiving, apprehending, or noticing with a degree of controlled thought or observation: capable of or marked by thought, will, design, or perception." *Berry v. Fife*, 590 So. 2d 884, 885 (Ala. 1991) (quoting *Webster's New Collegiate Dictionary* 239 (1981)).

For Taylor to prevail on a wantonness claim, there must be evidence that  White acted consciously with a purpose or design.  *See South Cent. Bell Tel. Co. v. Branum*, 568 So. 2d 795, 797 (Ala. 1990**)** ("[W]anton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.").  Because wantonness turns on the actor's state of mind, it may be established through circumstantial evidence from which a jury could reasonably infer a conscious disregard of a known risk. Taylor asserts that, based on the testimony of Dr. Nicholas Earnhart, White accelerated through the intersection where the accident took place .[6]  (Doc. 64 at 9-11).  Dr. Earnhart has a Ph.D. in mechanical engineering and began working in the field of accident reconstruction in January 2013.  (Doc. 64-7 at 5:12-6:10).  Dr. Earnhart testified that there was "no indication that White applied his brakes as he was coming down the hill like he talks about in his deposition." (*Id*. at 44:1-5).  Dr. Earnhart noted that he does not know whether White's Jake-brakes were on.  (*Id.* at 44:6-10).  He further testified that, according to his investigation, White applied his brakes four seconds from the collision and then two seconds before impact he removed his foot off the brake and, at the time of impact, "the throttle showed at 98.7 percent." (*Id*. at 62:2-9).  Dr. Earnhart testified that the throttle level showed him that White was pushing the accelerator "virtually all the way to the floor" at the time of impact.  (*Id*. at 62:10-

---

[6] In addition to the testimony of Dr. Earnhart, Taylor also cited evidence in the form of testimony by Don Vilfer, Taylor's proposed expert in extracting and analyzing cellular phone data. Salem Carriers has moved to preclude or exclude that testimony.  (Doc. 98).  Vilfer testified regarding whether White was using his phone immediately prior to the accident.  The discrepancy in accounts regarding what actions White took while approaching the intersection create a question of fact that would not be changed by Vilfer's testimony.  As such, Vilfer's testimony was not considered in the contexts of the summary judgment motion, and Salem Carriers' motion to preclude or exclude the testimony will be addressed by separate order.

13). According to Dr. Earnhart, for that to have happened White would have needed to take his foot off of the brake and put it onto the accelerator. (*Id*. at 62:14-23).

Dr. Earnhart's testimony is not, however, undisputed. White testified in his deposition that, prior to entering the intersection, he saw yellow flashing lights that indicated to him that he was approaching a red-light and began to apply his brakes. (Doc. 68-1 at 70:18-71:6). According to White, his brakes were not sufficiently slowing him down, so he applied his Jake brakes. (*Id*. at 71:12-72:2). As he was approaching the intersection, White indicated that he was "leaning on" his horn, applying his brakes as much as possible, and had his Jake brakes "on full." (*Id*. at 76:8-14). He testified that "at no point" between seeing the flashing yellow light and the accident did he accelerate his vehicle. (*Id* at 80:11-14).

Given the conflicting testimony, there is a question of fact regarding Taylor's wantonness claim against White that prevents the entry of summary judgment. Based on the testimony of Dr. Earnhart, a reasonable juror could infer that White purposely and recklessly accelerated into the intersection. But based on White's testimony, a reasonable juror could conclude the opposite. This evidence presents a genuine dispute of material fact regarding White's conduct in the moments leading up to the collision. If credited, Dr. Earnhart's testimony could permit a reasonable jury to infer that White consciously disregarded a known risk by accelerating into the intersection despite the need to stop. Conversely, if White's testimony is credited, a reasonable jury could conclude that he took affirmative steps to slow the truck and avoid the collision. Resolution of these competing accounts necessarily depends on credibility determinations, which are the province of the jury and are not appropriate for resolution at summary judgment.

White also moves for a summary judgment finding that Taylor is not eligible to recover punitive damages.  He asserts that even if Taylor did assert substantial evidence that White engaged in wanton conduct, she has not met the higher burden of producing clear and convincing evidence required to support an award of punitive damages.  (Doc. 75 at 5-7).  White's argument primarily rests on the argument that Taylor failed to establish a question of fact on her wantonness claim at all.  As discussed above, a reasonable juror could determine that White acted wantonly.  At the summary judgment stage, the Court's role is not to weigh the evidence or make credibility determinations. Rather, the Court must determine whether the evidence is such that a reasonable jury could find wantonness by clear and convincing evidence. *See Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 254-55 (1986) (holding that courts must consider the applicable evidentiary burden at summary judgment)."   For these reasons, the cross-motions for partial summary judgment are due to be DENIED as to wantonness.

### IV. Conclusion

Based on the foregoing, Salem Carriers' Motion for Partial Summary Judgment is **GRANTED** as to Taylor's claims of negligent entrustment, and negligent hiring, training, supervision, and retention.  (Doc. 66).  As Taylor has conceded her claims of negligent and wanton inspection and maintenance as well as wanton entrustment and wanton hiring, training, supervision, and retention against Salem Carriers (*see* doc. 80 at 7), Salem Carriers' Motion for Partial Summary Judgment is also **GRANTED** as to those claims.  (Doc. 66).  Taylor's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  (Doc. 63). Her motion is **GRANTED** as to her claim that White was an employee of Salem Carriers and acting within the line and scope of his employment at the time of the accident and **DENIED** as to

17

her claim of wanton conduct against White. (Doc. 63). Finally, White's Motion for Partial Summary Judgment is **DENIED**. (Doc. 74). The following claims remain for consideration by a jury: negligence and wantonness as to White. No further claims against Salem Carriers remain.

Given the foregoing, parties are **ORDERED** to confer and file a joint status report by **April 10, 2026**, concerning next steps in this case4. Specifically, the parties should indicate whether they believe magistrate judge-led-mediation would be beneficial.

DONE this 27th day of March, 2026.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE